UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA    )
           )
v.                         )        1:09-CR-181
           )        COLLIER/CARTER
WILLIAM LANDOLT        )

## REPORT AND RECOMMENDATION

### I. Introduction

Defendant William Landolt moves to suppress evidence found in his home during the execution of search warrants on two separate occasions.[1] The defendant asserts the search warrants were improperly obtained using tainted evidence gathered by law enforcement when they illegally entered his property and conducted "protective sweeps" of his residence. I conclude neither search warrant was fatally tainted by illegally obtained information. Accordingly, it is RECOMMENDED defendant's motion to suppress as to the August 21, 2009 search [Doc. 558] be DENIED, and defendant's motion to suppress as to the January 13, 2010 search [Doc. 577] be DENIED.

### II. Relevant Facts

An evidentiary hearing was held on defendant's motions to suppress on November 15, 2010. Another evidentiary hearing was held on February 22, 2011 on the August 21, 2009 search to address an issue raised for the first time in defendant's reply brief. (*See* February 7, 2011 Order, Doc. 985). The motions concern searches of defendant's residence at 1256 Gizzard Creek

---

[1]The defendant's Motions to Suppress (Docs. 558 and 577) are before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

Road in Sequatchie, Tennessee on August 21, 2009 and on January 13, 2010. Three witnesses, law enforcement officers, testified: Chad Johnson, Gene Hargis, and Keith Cox.

A. Chad Johnson

Chad Johnson testified as follows: He has been a detective with the Marion County Sheriff's Department for six years and during that time has been assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives Task Force. In August 2009 he was investigating methamphetamine trafficking in Marion County. On August 20, 2009, he had a text conversation with defendant's nephew, Michael Edenfield. He did not identify himself as a law enforcement officer in this conversation. Edenfield had come to Johnson's attention through a confidential informant (CI) who had talked with Edenfield on August 20, 2009. The CI indicated to Johnson that Edenfield and defendant, who were living at 1256 Gizzard Creek Road, were conducting drug activity on defendant's property at 1256 Gizzard Creek Road. However, the CI had not purchased drugs at that location, nor did he have information that drugs were at that location on August 21, 2009. The CI reported, however, that Edenfield had told him the defendant had a stolen four wheel all terrain vehicle (ATV) for sale. The CI said Edenfield had further told him the ATV had been yellow but was repainted black. Agent Blanchett, who was assisting Johnson in the investigation, told Johnson he had been investigating the recent theft of a yellow Honda ATV taken from a residence "down the road" from 1256 Gizzard Creek Road.

Posing as a potential buyer of the ATV, Johnson used the CI's cell phone to text Edenfield about the ATV. Johnson thought inquiring about purchasing it might be a way to gain access to defendant's property to investigate suspected drug activity. Johnson offered to trade pseudoephedrine tablets, a methamphetamine precursor, for the ATV. Edenfield said his uncle

didn't "shake," meaning he didn't make methamphetamine using the "shake and bake" method, but Edenfield indicated defendant might trade firearms for the ATV. The CI was also to bring $500.00 for the ATV. Edenfield also indicated defendant obtained 50 pounds per month in marijuana from Texas.

Johnson arranged to have the CI meet Edenfield at defendant's property, 1256 Gizzard Creek Road, the following day. Johnson had a wire placed on the CI and the CI was carrying several boxes of pseudoephedrine. In an attempt to purchase methamphetamine, the CI and Edenfield left 1256 Gizzard Creek Road to go to another residence in Tracy City, Tennessee. Johnson and other officers were following but lost visual and audio contact. Later, the CI contacted Johnson and told him he and Edenfield were going back to defendant's home and Johnson should meet them at the intersection of Gizzard Creek Road and Highway 150.

Johnson and TBI Agent Delany, acting as undercover associates of the CI, drove a van to the intersection of Gizzard Creek Road and Highway 150. Other officers in raid gear were hiding in the back of the van. At the intersection, Edenfield motioned for Johnson to follow him down Gizzard Creek Road. They pulled into the dirt driveway at 1256 Gizzard Creek Road. There was a red metal fence with a "Beware of Dog" sign an the entrance and from there it was about 150 yards to the house. The fence was open. There were woods on either side of the driveway and a camper on their left near the house. There were also several small outbuildings on the property. At the November 15, 2010 hearing, Johnson testified he saw the defendant, approximately 200 to 300 feet from the house, sitting on the ATV in the driveway with the engine running. At the February 22, 2011 hearing, Johnson testified the distance from the gate to the house was about 75 yards and the defendant on the ATV approximately 20 to 30 yards past the gate.

With guns drawn, all agents exited the van and immediately subdued and handcuffed Landolt and Edenfield. Landolt was detained without incident, but Agent Heath Frizzell tackled Edenfield when he thought Edenfield was reaching for a firearm. Johnson then handcuffed a belligerent Edenfield. Officers confirmed the ATV was stolen by checking the VIN number. At the November 15, 2010 suppression hearing, Johnson testified that Landolt and Edenfield were immediately placed under arrest when the agents exited the van. At the February 22, 2011 hearing, Johnson testified that while defendant and Edenfield were immediately detained and handcuffed upon the agent's arrival, defendant and Edenfiled were not placed under arrest until other agents had conducted a protective sweep of the house and had checked the VIN number of the ATV to confirm it was stolen. Regardless of whether Johnson characterizes the initial detention as an arrest or as an investigatory detention, his testimony did not vary as to what the agents actually did upon arriving at 1256 Gizzard Creek Road.

After defendant and Edenfield were first detained, Johnson remained with defendant and Edenfield while other agents went inside the defendant's house where they saw a firearm, ammunition, spoons and syringes. They also smelled the "unique odor" of methamphetamine manufacturing. Nothing was seized in the house at this time. Once everyone was secure, Johnson had defendant and Edenfield transported to jail, and Johnson left to obtain a search warrant. The search warrant was executed that same day and numerous items associated with methamphetamine manufacturing as well as firearms and ammunition were found in out-buildings on the property, in the woods on the property, and in the house.

Though Johnson did not have information from the CI that firearms were on the Gizzard Creek property, Johnson knew on August 21, 2010 that defendant had previously been convicted

of a felony in Florida, that defendant had been in a recent traffic accident and had a firearm in his car at that time, and that agents had seen firearms in defendant's house within the last six months when they had gone to interview defendant regarding his son as part of a homicide investigation. At the time agents had gone to interview him, however, the agents had not been aware the defendant had been convicted of a felony in Florida. Prior to arriving at 1256 Gizzard Creek Road, on August 21, 2009, Johnson informed the other officers in the van there may be firearms at the residence.

At the February 22, 2011 hearing, Johnson testified that in August 2009, the CI was new to the area, but he (Johnson) had just recently used this same CI in one controlled buy of illegal drugs. Johnson also testified that the CI was able to give him information about drug trafficking which Johnson already knew to be true because of his prior investigations. Finally, when the CI first arrived in the area, he told Johnson he had operated as a CI in Oregon and had provided information which had lead to arrests and convictions in Oregon. Johnson called officials in Oregon and was able to confirm this information as true.

B. Gene Hargis

   *1. The August 21, 2009 Search*

Gene Hargis testified as follows: He has been employed with the Marion County Sheriff's Department for 20 years. On August 21, 2009, he was the chief detective for the Marion County Sheriff's Department. On August 21, 2009, he traveled with Chad Johnson to recover a stolen ATV. He was hidden in the back of the van. Once arriving at their destination, 1256 Gizzard Creek Road, Agent Delany and he secured the defendant who was sitting on the ATV beside the driveway. The defendant was approximately 40 or 50 yards from the house

when he was arrested.  After the defendant was secured, Hargis saw a woman exit the front door

of the residence and then rush back inside.  He and other officers decided to conduct a protective

sweep of the house to make sure the woman had not re-entered the house to secure a firearm.

They also were concerned about anyone else in the house who could pose a threat to them.  They

looked only where a person could be found and the sweep took only four or five minutes.  During

the sweep, they saw weapons and drug paraphernalia in plain view. They also found the woman

and removed her.

Hargis has investigated over 700 methamphetamine labs during his police career, and he

is familiar with the smell of a methamphetamine lab as well as the items used to manufacture

methamphetamine.  As he approached the house to conduct the protective sweep he smelled the

strong odor of a methamphetamine lab.  There were multiple syringes and spoons with cotton

balls lying in plain view on the floor of the house, and ammunition was openly visible on the

dressers in the bedrooms.  Hargis and the other officers then reported to Det. Johnson what they

had seen, and Det. Johnson left to obtain a search warrant.

   *2. The January 13, 2010 Search*

On January 13, 2010, Deputy Cox informed Deputy Hargis by phone that he and Deputy

Rittenberry had been sent on a call in the early morning hours of January 13, 2010 to investigate

a woman for disorderliness.  The woman, who was intoxicated, had told Rittenberry and Cox that

her baby had died and the baby was in the defendant's residence just down the road.  Cox and

Rittenberry had gone to defendant's residence at 1256 Gizzard Creek Road to investigate.

During the investigation, they had gone to the defendant's door to talk with him and saw items

indicative of methamphetamine manufacturing in plain view outside the house.  They had seen a

jar with bi-level liquids next to a burn pile in the front yard near the house. They also saw a syringe, tubing, and an empty cold pack lying on the floor of the porch in front of the front door. They knew chemicals from the cold pack could be used in manufacturing methamphetamine. Based on the information Deputy Cox gave Hargis, he applied for and obtained a search warrant for 1256 Gizzard Creek Road. The search warrant was executed, incriminating items were found inside and outside the residence, and defendant was arrested for methamphetamine manufacturing. He did not make a statement at this time.

C. Keith Cox

*The January 13, 2010, Search*

Keith Cox testified to the following: He has been a deputy with the Marion County Sheriff's Department for 9 ½ years. On January 13, 2010, at about 2:30 a.m., he and Deputy Rittenberry received a call over his radio that a woman, later identified as Mrs. King, on Gizzard Creek Road, was very distressed and beating on a door. He went to investigate. It was very cold and the woman was dressed in jeans, a t-shirt and no shoes. She told him her baby had died at the hospital. He contacted all the hospitals in the area and was told no baby had died there recently. She then said the baby was at Uncle Willie's house up the road. They got in the patrol car and drove to a driveway as directed by Mrs. King. Uncle Willie turned out to be the defendant, William Landolt. There was a red gate across the driveway which had two signs posted on it: one said "No Trespassing" and the other said, "We don't call 911." Cox and Rittenberry parked the patrol car at the gate and walked the approximately 100 yards to the defendant's residence. They left Mrs. King in the patrol car.

As he approached the house, Cox heard someone running through the woods. As he stepped up onto the porch, Cox saw a mason jar with a bi-level liquid, plastic tubing, syringes and a cold pack outside on the porch in front of the front door. He could also smell an "overwhelming" odor associated with a methamphetamine "cook." He recognized the odor and the items because he has received training in methamphetamine manufacturing. Cox knocked on the front door and identified himself as being with the Sheriff's Department. Defendant came to the door but refused Cox's entrance. Defendant told Cox that the baby in question was in state custody. Cox told the defendant he had heard someone running in the woods and asked defendant if he wanted him (Cox) to look around the property. Defendant stated yes, that he had received some death threats. While walking around outside the house near the garage Cox discovered a plastic bottle with tubing, an item he knew could be used to manufacture methamphetamine. Cox returned and arrested the defendant, who was standing outside, for manufacturing methamphetamine. Cox and Rittenberry placed the defendant in the patrol car with Mrs. King and returned to the house to conduct a protective sweep for "officer safety." Cox then made a report to Hargis who prepared an affidavit and obtained a search warrant. Cox testified that he only told Hargis about the things he saw and smelled outside the house; he did not tell Hargis anything about what he saw in the house during the protective sweep.

### III. Analysis

Assuming all the information in the two search warrant affidavits was lawfully obtained, then defendant does not contest the adequacy of the warrants to search his house on August 21, 2009 and January 13, 2010. However, it is the defendant's position that the search warrants at

issue are fatally tainted by illegally obtained evidence, and, therefore, all evidence found during the executions of the search warrants must be suppressed.

<u>A. The August 21, 2009, Search Warrant</u>

Defendant argues the protective sweep was not lawful, and, therefore, the information gathered from the protective sweep and included in the affidavit cannot be used to support the search warrant in question. The affidavit used to secure the August 21, 2009 search warrant was based, in large part, on the evidence officers had seen that same day during a protective sweep of defendant's house which the officers conducted after they arrested defendant and Edenfield. The affidavit observes that officers inside the house saw drug paraphernalia, *i.e.*, needles, tin foil, and spoons, and ammunition and a rifle. The affidavit also states the officers smelled the odor of methamphetamine manufacturing inside the house.

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Michigan v. Fisher*, 130 S.Ct. 546, 548 (2009). Certain exigencies, however, can overcome this presumption. *Id.* "Because warrantless searches are presumptively unreasonable under the Fourth Amendment, the government bears a 'heavy burden' of proving exigency." *United States v. McClain,* 444 F.3d 556, 562 (6th Cir. 2005) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). The protective sweep is one of those exigencies.

In *Maryland v. Buie*, 494 U.S. 325, 337 (1990), the Supreme Court held, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing danger to those on the arrest scene." *See also United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007). A protective sweep is aimed at

protecting the arresting officers.  *Buie*, 494 U.S. at 335.  If justified at its inception by the circumstances, it "may extend to only a cursory search of those spaces where a person may be found," and "last[] no longer that is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  *Id.* at 335-36.

The protective sweep exception to the search warrant has been extended to situations where the arrest takes place immediately outside the place subject to the protective sweep. *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) ("We decline to adopt a bright-line rule that prohibits police officers from conducting a protective sweep of a home every time they arrest a defendant outside that home, regardless of the potential danger from other persons inside.")*; see e.g., United States v. Atchley*, 474 F.3d 840, 849-50 (6th Cir. 2007) (protective sweep of motel room after arrest of occupant outside the motel room was permissible where police had a reasonable and articulable basis to believe another person who might be armed was hiding in the motel room).

Further, the Sixth Circuit has not limited protective sweeps to arrest situations only.   In *United States v. Taylor*, 248 F.3d 506, 513-14 (6th Cir. 2001), the Sixth Circuit permitted a cursory search of the premises for people who threatened officers' safety while the officers waited for a search warrant to be obtained.  No arrest had been made at the time the protective sweep was conducted.  However, the *Taylor* Court noted "the officers had acted properly to secure the premises and wait for a search warrant before conducting a search of Taylor's apartment."  *Id.* at 514. Officers cannot create situations in which they may be placed in harm's way in order to justify a protective sweep unless they have a valid reason to do so.  *United States v. Campbell*, 261 F.3d 628, 633 (2001) ("It is well established that police officers are not free to

create exigent circumstances to justify their warrantless searches.") (citing *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir.1984)).  Thus, the undersigned turns first to the question of whether Johnson had a constitutional basis to detain defendant at the time the protective sweep was conducted.

The Fourth Amendment requires every arrest to be supported by probable cause.  *Harris v. Bornhorst*, 513 F.3d 503, 516 (6th Cir. 2008).  The probable cause standard is a "practical, nontechnical concept."  *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).  Probable cause is a "fluid concept" that turns on a calculation of probabilities; it is not "reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.  "Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar*, 338 U.S. at 175-76.  Whether the officers had probable cause to arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.  *Adams v. Williams*, 407 U.S. 143, 148 (1972) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  The *establishment of probable cause "requires only a probability or substantial chance of criminal* activity, not an actual showing of such activity." *United States v. Ogbuh*, 982 F.2d 1000, 1002 (6th Cir.1993) (quoting *Gates*, 462 U.S. at 244 n. 13).

Even if an officer does not have probable cause to arrest a suspect, an officer may nevertheless detain an individual for a brief period of time for investigatory purposes where the

officer has a reasonable suspicion based on specific and articulable facts that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Saucedo*, 226 F. 3d 782, 788 (2000). Reasonable suspicion is less than probable cause but more than an inchoate suspicion or hunch. Saucedo, 226 F.3d at 788-89. The "reasonableness" of an "articulable suspicion" is assessed with reference to the totality of the relevant circumstances and must be directed at the person to be detained. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Finally, the investigatory stop itself must be both reasonable in its inception and reasonably related in its scope. *Saucedo,* 226 F.3d at 789.

Johnson had information from a CI who had provided reliable information in the past that Edenfield said his uncle had a stolen ATV for sale. Edenfield told the CI that the ATV had been yellow but was repainted black. Johnson then talked to Edenfield himself about buying the ATV for $500.00 and a firearm. Det. Blancett told Johnson that a yellow ATV had been stolen recently from a residence close to 1256 Gizzard Creek Road. When Johnson arrived at defendant's residence after Johnson and Edenfield had made plans to meet there for the purchase of the ATV, defendant was sitting on a black ATV. At the very least, this information supplies reasonable suspicion to detain defendant and Edenfield to investigate the theft of the ATV. Further, Johnson had reliable information which he passed on to the other officers prior to defendant's detention that defendant carried firearms and might have one on him or in the house. The officers were in defendant's "territory," and Edenfield had told Johnson he cooked methamphetamine. Like peanut butter and jelly, drugs and guns often go together. I conclude the agents' decision to detain defendant with guns drawn and to handcuff him before checking the ATV's VIN number was not unreasonable. "During a Terry stop, officers may draw their

weapons or use handcuffs 'so long as circumstances warrant that precaution.' " *Dorsey v. Barber*,

517 F.3d 389, 399 (6th Cir. 2008) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309

(6th Cir.2005)).

Since the agents had a constitutional basis to detain defendant, the undersigned now turns

to the question of whether the agents had a constitutional basis to conduct a protective sweep.

There are two types of protective sweeps:

> The first type allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. The second type of sweep goes "beyond" immediately adjoining areas but is confined to "such a protective sweep, aimed at protecting the arresting officers[.]" *Id.* at 334-35, 110 S.Ct. 1093. The first type of sweep requires no probable cause or reasonable suspicion, while the second requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. 1093. The Supreme Court also "emphasize[d]" that this second kind of sweep is "not a full search of the premises," but "extend[s] only to a cursory inspection of those spaces where a person may be found" and should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36, 110 S.Ct. 1093.

*United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009). In the instant case, we are

concerned with the second type of protective search. The agents had a reasonable basis to

believe that firearms were in the house, and they knew that someone else was in the house

because they saw a woman run into the house after she saw them outside the house. While the

officers were relatively far away from the house, about 40 to 50 yards, a firearm can be

discharged accurately from that distance. I conclude the agents had a reasonable basis to believe

the house harbored an individual posing a danger to the agents on the scene. Accordingly, I will

recommend defendant's motion to suppress evidence discovered at his residence on August 21, 2009 be DENIED.

B. The January 13, 2010, Search Warrant

Defendant argues the affidavit used to obtain the search warrant for his residence on January 13, 2010 was also fatally tainted with illegally obtained information gathered by Deputies Cox and Rittenberry. Defendant asserts the information was tainted because the deputies violated the Fourth Amendment by entering his property without defendant's permission or a warrant. Since the search warrant was invalid, continues the argument, all evidence found as a result of its execution must be suppressed.

The government argues Cox obtained defendant's consent to walk around the property to look for an intruder. The government misses the point. Defendant asserts Cox's initial entry onto his property, before he talked to defendant, was illegal thereby rendering tainted all evidence found that evening on the property.

Analysis of the defendant's argument requires an understanding of "open fields" and "curtilage." "'[O]pen fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example, .... a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 180 n. 11 (1984). There is no legitimate expectation of privacy under the Fourth Amendment for an "open field." *Id.* at 177-181. This may be so even where the open field is enclosed and marked with 'No Trespassing" signs. *Id*. at 179*; see also Widgren v. Maple Grove Tp.*, 429 F.3d 575, 580 (6th Cir. 2005) ("The presence of "No Trespassing" signs ... does not transform the open fields into

14

an area where an expectation of privacy is necessarily reasonable"); *United States v. Rapanos*, 115 F.3d 367, 372-73 (6th Cir.1997) (explaining that the "presence of fences, closed or locked gates, and 'No Trespassing' signs on an otherwise open field ... has no constitutional import").

Curtilage is that area immediately surrounding the home, "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver*, 466 U.S. at 179-80; *accord Jacob v. Township of West Bloomfield*, 531 F.3d 385, 389 (6th Cir. 2008); *United States v. Jenkins,* 124 F.3d 768, 772 (6th Cir. 1997). "The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house...." *States v. Dunn*, 480 U.S. 294, 300 (1987). "It is well established that the protection provided by the Fourth Amendment extends to the "curtilage" area of a house."*Jenkins,* 124 F.3d at 772 (citing *United Dunn*, 480 U.S. at 300-01; *see also, Jacob*, 531 F.3d at 389.

Notwithstanding the Fourth Amendment's protection of curtilage, generally, a police officer may lawfully approach the front door to a residence to knock and ask questions. *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006) ("Police officers are permitted to enter private property and approach the front door to ask questions or ask for consent to search the premises.") *See also Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964) ("Absent express orders from the person in possession," an officer may "walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking questions of the occupant thereof"); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir.2001) (no Fourth Amendment violation when deputy sheriff entered onto curtilage of defendant's home where no signs or barriers forbidding trespass were located at ten-foot-wide opening in a makeshift fence of debris encircling property).

The ability of police to lawfully approach a front door gives way, however, when the occupant has taken measures to prevent the general public from accessing the front door and a reasonable police officer would be put on notice of the occupant's desire for privacy. *Id.; see also Edens v. Kennedy*, 2004 WL 1737880 *4 (4th Cir. Aug. 4, 2004) (per curiam) ("We hold ... that if the owner of a home encloses the curtilage with a fence, locks the gate, and posts "No Trespassing" signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage. This is because the act of sealing the property creates an elevated expectation of privacy.")

In the early morning hours of January 13, 2010, Cox walked approximately 150 yards from a locked gate, bearing a "No Trespassing" sign and a sign stating "we don't call 911," down a dirt driveway leading through thick woods to defendant's residence. He walked onto the front porch, knocked on the front door and asked the defendant about the whereabouts and welfare of a baby. He did not enter the residence.

The gate where Cox had to stop and begin walking to the house was not within the curtilage of the defendant's residence; it was in an "open field." Consequently, Cox's decision to walk past the gate down the driveway did not constitute a "search" within the meaning of the Fourth Amendment. However, once Cox walked onto the porch, an area immediately adjacent to the house and normally associated with the privacies of life, he was on the curtilage of defendant's home.

As previously discussed, such an approach to front door does not usually constitute a violation of the Fourth Amendment. But in this instance, defendant had indicated by means of the "No Trespassing" and "we don't call 911" signs along with the locked gate that he wished to

maintain his privacy.  Further, the home and its front porch were secluded by a 150 yard

driveway and were surrounded by woods.  The porch could not be seen by the public from

Gizzard Creek Road and the public could not drive to his house because of the locked gate.

Thus, defendant has a strong argument that, absent a warrant or exigent circumstances, Cox

violated the Fourth Amendment simply by walking onto the front porch.   The undersigned does

not need to reach this issue, however, because exigent circumstances did exist which justified

Cox's limited intrusion.

　　　Under the emergency aid exception to the warrant requirement, an officer may enter a

home to render aid if he has an objectively reasonable belief that a person within is in need of

immediate aid.  *Michigan v. Fisher*, 130 S.Ct. 546 (2009).  To invoke this exception, "[o]fficers

do not need ironclad proof of 'a likely serious, life threatening' injury to invoke the emergency

aid exception." *Id.* at 549.  In the instant case, police dispatch received a call that a woman was

beating frantically on a neighbor's door.  When Cox arrived, he found an hysterical, albeit

intoxicated, woman saying her baby had just died at a local hospital.  A call to the local hospitals

revealed no baby had died recently. The woman then said the baby had died at Uncle Willie's

house.  At this point, all the officer really knew was that this very upset, intoxicated woman said

she had a baby, and the baby was unaccounted for.  Babies are quite helpless. The baby needed to

be accounted for quickly.  Had the officer stopped at the gate and determined to go no further to

inquire of the welfare of the baby, he would have been in dereliction of his duty.  The need to

ascertain the whereabouts and welfare of the baby quickly was compelling whereas the level of

intrusion, knocking on the defendant's door, was minimal.  The touchstone of the Fourth

Amendment is reasonableness, *Katz v. United States*, 389 U.S. 347, 360 (1967), and the officer

acted reasonably in this instance. *See Buie*, 494 U.S. at 331 ("our cases show that in determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.")

In the alternative, I conclude Cox's knocking on the defendant's door did not constitute a search for purposes of the Fourth Amendment. *See Taylor v. Michigan Dept. of Natural Resources,* 502 F.3d 452, 455 (6th Cir. 2007). As the *Taylor* court explained,

> The occurrence of a "search" is defined in terms of whether a person had a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). When interpreting the *Katz* definition, a "reasonable expectation of privacy" exists when (1) "the individual [has] manifested a subjective expectation of privacy in the object of the challenged search" and (2) "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

*Id.* In *Taylor*, an officer drove past a "No Trespassing" sign down a secluded driveway to a house where he looked in the windows and turned the doorknobs after he saw tracks in the snow leading him to worry that the house, which he thought was unoccupied, might have been burglarized. The homeowner sued alleging a violation of his Fourth Amendment rights. The court held that while the homeowner met the first part of the *Katz* test, he did not meet the second part given the limited means of the intrusion and its purpose. *Id.* at 456. The court concluded that since the homeowner did not have an expectation of privacy which society is willing to recognize as reasonable, then there was no search as defined by the Fourth Amendment *Id.*

In the instant case, the defendant had a subjective expectation of privacy. However, I conclude, given Officer Cox's limited intrusion, knocking on the door, and the purpose of the

visit, to check on the welfare of a baby, that defendant's expectation of privacy under those circumstances was not one that society is willing to recognize as reasonable. Thus, up to the point in time in which Cox knocked on the door and questioned the defendant, no Fourth Amendment search had occurred.

Finally, I credit Cox's testimony that defendant gave Cox consent to look around the property after defendant told Cox he had received death threats. With defendant's voluntary and knowing consent, Cox's further exploration of defendant's property outside the house was lawful. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consequently, I conclude all the information in the affidavit used to obtain the search warrant on January 13, 2010 was lawfully obtained, and, accordingly, there is no reason to set aside the search warrant and suppress the evidence found when the warrant was executed.

## IV. Conclusion

For the reasons stated herein, it is RECOMMENDED[2] defendant's motion to suppress be DENIED as to the August 21, 2009 search and be DENIED as to the January 13, 2010 search.

*s/William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).